UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

LINDSAY BAYS,
individually and as Mother,
Guardian, and Next of Friend to
LUKE BAYS,
Minor child,

       Plaintiffs,

v.                        Civil Action No. 2:11-0939

CORCELL INC.,
a Corporation, and
CORD BLOOD AMERICA,
a Corporation, and
PROGENITOR CELL THERAPY, LLC,
a Corporation and
BERGEN COMMUNITY BLOOD CENTER
a Corporation,

       Defendants.

MEMORANDUM OPINION AND ORDER

        Pending are defendant Progenitor Cell Therapy, LLC's
("Progenitor"), motions to dismiss for lack of personal
jurisdiction, to dismiss for improper venue, and to transfer due
to forum non conveniens, filed November 30, 2011, defendant
Bergen Community Blood Center's ("Bergen") motion and amended
motion to dismiss for lack of personal jurisdiction, filed
November 30, 2011, and defendant Cord Blood America Inc.'s
("Cord Blood") motion to dismiss, filed December 5, 2011.

Bergen's amended motion to dismiss is identical to the
motion it originally filed seeking that same relief except for
the addition of an exhibit inadvertently omitted.  It is,
accordingly, ORDERED that the initial motion to dismiss be, and
it hereby is, denied without prejudice.


I.


Plaintiff Lindsay Bays is a West Virginia resident.
She is the guardian, next friend, and mother of Luke Bays.  Luke
is four-years old.  CorCell is a citizen of Pennsylvania and New
Jersey.  It is a wholly-owned subsidiary of Cord Blood, which is
a citizen of Florida and Nevada.  Progenitor is a citizen of
Delaware and New Jersey.  Bergen is a New Jersey citizen.

On February 12, 2007, Ms. Bays and her husband
contracted with CorCell under a Participation Agreement to
collect and store the blood from her umbilical cord at the time
of Luke's birth.  CorCell had previously marketed and displayed
its services to Ms. Bays as a means for preserving stem cells.
Those stem cells are said to allow the rebuilding of an
individual's blood system to allow for other types of
regenerative therapies.  CorCell marketed its services as

2

allowing for the treatment and improvement of life quality for those Bays' family members who might fall prey to a serious illness such as leukemia, anemia, Hodgkins Disease, Alzheimer's disease and cerebral palsy.

At the same time that the Participation Agreement was executed, an Informed Consent and Release accord was signed by Ms. Bays and her husband.  It provided materially as follows:

> As a participant in The CorCell Program, I, on behalf of myself, my unborn child . . . hereby release and forever discharge CorCell . . . or any or its affiliates, successors, assigns, officers, directors, employees, agents, independent contractors and subcontractors from any kind and all actions, causes of action, claims and demands and any and all other claims of every kind, nature and description whatsoever, both in law and equity, which may arise from or relate in any way to my participation in The CorCell Program, and/or the collection or transport of [any sample] contemplated hereunder, and agree not to institute any action or suit against said parties except if such actions arise out of willful or malicious conduct by CorCell . . . .
>
> Also, as a participant in The CorCell Program, I, on behalf of myself and my unborn child . . . agree, that if CorCell is found liable for willful or malicious conduct, the amount of damages that you [sic] may recover from CorCell shall not be greater than and shall be limited to the amount of money paid by me . . . to CorCell under this Agreement.  CorCell will not be liable for any other damage.  CorCell will only be responsible for exercising ordinary care in the performance of its duties under this Agreement. CorCell will not be liable for any damage caused by third parties.  On surrender of the Cord Blood, all

> liability of CorCell will terminate. You should
> understand that CorCell is not making any warranty
> with respect to the services performed by CorCell
> under this Agreement.
>
> I understand the meaning and consequences of this
> Informed Consent and Release, having discussed it with
> my attorney to the extent that I deemed appropriate.

(Inform. Consent and Rel. at 1).

On February 26, 2007, Luke was born at Women and Children's Hospital ("the hospital") in Charleston.  Pursuant to the Participation Agreement, the umbilical cord cell blood ("the sample") was collected by the hospital and sent to CorCell's lab.  When the sample arrived, CorCell transferred it to a Bergen storage facility pursuant to a contract between those two entities.  In October of 2007, however, CorCell ceased using Bergen's storage facility.  It contracted instead with Progenitor, which maintained a New Jersey storage facility.  Ms. Bays paid monthly storage fees to Cord Blood, not CorCell, to assure the safekeeping of the sample in the event it was needed.

As Luke matured, developmental delays appeared.  At two years of age, he was diagnosed with cerebral palsy. In June 2009, Ms. Bays was referred to the Pediatric Blood and Marrow Transplant Program ("Program") at Duke University.  The planned course of treatment involved use of the sample as a therapy for

Luke's condition.  Following preliminary screening, the Program accepted Luke as a candidate for autoreinfusion treatment.

The autoreinfusion therapy was planned for September 22, 2009.  During the retrieval and pre-shipping process for the sample, however, CorCell and Progenitor noticed barcode discrepancies.  This raised serious questions respecting whether the sample belonged to Ms. Bays.

Laboratory testing of the sample followed, which was designed to confirm that it originated with Ms. Bays.  The sample was then shipped to the Program.  Upon receipt of the sample, however, the Program noted labeling concerns that revived the earlier uncertainty about the sample's origin.  That uncertainty led the Program to conclude that the medical risks of the planned autoreinfusion treatment were too great.  On October 2, 2009, Ms. Bays was informed by the Program at Duke that it was rescinding Luke's admission.

As part of its quality control protocol, Cord Blood, not CorCell, conducted an internal investigation into the matter.  It concluded that the sample was first mislabeled by Bergen and then shipped to the Program by Progenitor without accompanying documentation confirming its identity.

On September 21, 2011, Ms. Bays instituted this action in the Circuit Court of Kanawha County.  She alleges claims for (1) breach of contract by CorCell, along with its alleged "negligent[] hiring and . . . [retention]" of Bergen and Progenitor, (2) breach of contract by Bergen and Progenitor of their written accord with CorCell and Cord Blood, a contract to which Ms. Bays alleges she is a third-party beneficiary, (3) negligence against all defendants, (4) violation by all defendants of the West Virginia Medical Professional Liability Act ("MPLA"), West Virginia Code sections 55-7B-1, et seq., assuming arguendo that the MPLA applies under these circumstances, (5) intentional infliction of emotional distress by all defendants, and (6) successor liability.  She seeks compensatory and punitive damages.

Progenitor moves to dismiss for lack of personal jurisdiction and improper venue or, in the alternative, to transfer due to forum non conveniens.  Bergen moves to dismiss for lack of personal jurisdiction.  Cord Blood moves to dismiss for lack of personal jurisdiction and failure to state a claim.

II.

**A.   Governing Standards**

**1. Rule 12(b)(6)**

Federal Rule of Civil Procedure 8(a)(2) requires that a pleader provide "a short and plain statement of the claim showing . . . entitle[ment] to relief."  Fed. R. Civ. P. 8(a)(2); Erickson v. Pardus, 551 U.S. 89, 93 (2007).  Rule 12(b)(6) correspondingly permits a defendant to challenge a complaint when it "fail[s] to state a claim upon which relief can be granted . . . ."  Fed. R. Civ. P. 12(b)(6).

The required "short and plain statement" must provide "'fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 545 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), overruled on other grounds, Twombly, 550 U.S. at 563); see also Anderson v. Sara Lee Corp., 508 F.3d 181, 188 (4th Cir. 2007). In order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S.

at 570); see also Monroe v. City of Charlottesville, 579 F.3d
380, 386 (4th Cir. 2009).

Application of the Rule 12(b)(6) standard requires
that the court "'accept as true all of the factual allegations
contained in the complaint . . . .'" Erickson, 551 U.S. at 94
(quoting Twombly, 550 U.S. at 555-556); see also South Carolina
Dept. Of Health And Environmental Control v. Commerce and
Industry Ins. Co., 372 F.3d 245, 255 (4th Cir. 2004) (quoting
Franks v. Ross, 313 F.3d 184, 192 (4th Cir. 2002)).  The court
must also "draw[] all reasonable . . . inferences from th[e]
facts in the plaintiff's favor . . . ."  Edwards v. City of
Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999).


2. Personal Jurisdiction


Personal jurisdiction differs from subject-matter
jurisdiction.  It is designed to protect an individual liberty
interest rather than an institutional interest.  J. McIntyre
Machinery, Ltd. v. Nicastro, 131 S. Ct. 2780, 2789 (2011)
(plurality); Constantine v. Rectors and Visitors of George Mason
University, 411 F.3d 474, 480 (4th Cir. 2005); Insurance Corp.
of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694,
702 (1982) ("The requirement that a court have personal

jurisdiction . . . represents a restriction on judicial power . . . as a matter of individual liberty.").

A Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction involves both procedural and substantive components. On the procedural side,

> the plaintiff ultimately bears the burden of proving to the district court judge the existence of jurisdiction over the defendant by a preponderance of the evidence. Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). "But when, as here, the court addresses the question on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge."

New Wellington Financial Corp. v. Flagship Resort Development Corp., 416 F.3d 290, 294 (4th Cir. 2005) (emphasis added) (citations omitted); Mitrano v. Hawes, 377 F.3d 402, 407 (4th Cir. 2004); Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 396 (4th Cir. 2003).

Importantly, "'[a] threshold prima facie finding . . . [of] personal jurisdiction . . . does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing.'" New Wellington, 416 F.3d at 294 n.5 (quoting Production Group Int'l v. Goldman, 337 F. Supp.2d 788, 793 n. 2 (E.D. Va. 2004) (citation omitted)).

Respecting the substantive component, the nonmovant is faced with two hurdles.  First, he must identify, and bring the nonresident within, the terms of an applicable state long-arm statute.  Second, the nonmovant must show that the exercise of personal jurisdiction would be consistent with the Due Process Clause of the Fourteenth Amendment.  See Consulting Engineers Corp. v. Geometric Ltd., 561 F.3d 273, 277 (4th Cir. 2009); Mitrano, 377 F.3d at 407; English & Smith v. Metzger, 901 F.2d 36, 38 (4th Cir. 1990).

Inasmuch as our court of appeals has held that the West Virginia long-arm statute is coextensive with the proper reach of due process, In re Celotex Corp., 124 F.3d 619, 627 (4th Cir. 1997), the two-part inquiry merges into one, namely, whether the exercise of personal jurisdiction over the nonresident defendant will comport with due process.

The due process requirement is satisfied if the defendant has "minimum contacts" with the forum.  These contacts must be of a quality and quantum that requiring the nonresident party to defend its interests within the state would "not offend traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (internal quotation marks omitted); Goodyear Dunlop Tires

Operations, S.A. v. Brown, 131 S. Ct. 2846, 2848 (2011);

Mitrano, 377 F.3d at 407; Carefirst, 334 F.3d at 396.

      In sum, "[a] defendant should be able to anticipate
being sued in a court that can exercise personal jurisdiction
over him; thus, to justify an exercise of jurisdiction, a
defendant's actions must have been 'directed at the forum state
in more than a random, fortuitous, or attenuated way.'"
Mitrano, 377 F.3d at 407 (citing ESAB Group, Inc. v. Centricut,
Inc., 126 F.3d 617, 625 (4th Cir. 1997)); ePlus, 313 F.3d at
176.  Put another way, "there must 'be some act by which the
defendant purposefully avails itself of the privilege of
conducting activities within the forum State, thus invoking the
benefits and protections of its laws.'"  Base Metal Trading,
Ltd. v. OJSC "Novokuznetsky Aluminum Factory, 283 F.3d 208, 213
(4th Cir. 2002) (quoting Hanson v. Denckla, 357 U.S. 235, 253
(1958); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462,
474-76 (1985).

      The standard for determining whether a court may
exercise personal jurisdiction over a nonresident defendant
depends on whether that defendant's contacts with the forum
state provide the basis for the suit. See Mitrano, 377 F.3d at
406-07; Carefirst, 334 F.3d at 397.  If so, the court applies

the standard for specific jurisdiction, as more fully discussed
in the recent Goodyear decision:

> First, the Court recognized that jurisdiction could be
> asserted where the corporation's in-state activity is
> "continuous and systematic" and gave rise to the
> episode-in-suit. It also observed that the commission
> of "single or occasional acts" in a State may be
> sufficient to render a corporation answerable in that
> State with respect to those acts, though not with
> respect to matters unrelated to the forum connections.
> These two categories compose what is now known as
> "specific jurisdiction."

Goodyear, 131 S. Ct. at 2848-49 (citations omitted).

        If the specific contacts do not provide the basis for
the suit, the International Shoe standard may still be satisfied
in terms of the second basis for the exercise of judicial power,
namely, general jurisdiction, explained more fully in the recent
plurality opinion in J. McIntyre:

> A person may submit to a State's authority in a number of
> ways. There is, of course, explicit consent. Presence
> within a State at the time suit commences through service
> of process is another example. Citizenship or domicile --
> or, by analogy, incorporation or principal place of
> business for corporations -- also indicates general
> submission to a State's powers. Each of these examples
> reveals circumstances, or a course of conduct, from which
> it is proper to infer an intention to benefit from and thus
> an intention to submit to the laws of the forum State.
> These examples support exercise of the general jurisdiction
> of the State's courts and allow the State to resolve both
> matters that originate within the State and those based on
> activities and events elsewhere. By contrast, those who
> live or operate primarily outside a State have a due
> process right not to be subjected to judgment in its courts
> as a general matter.

J. McIntyre, 131 S. Ct. at 2787 (citations omitted).

While the standards governing general jurisdiction are essentially confined to the foregoing excerpt, the requirements for specific jurisdiction require coverage in greater depth.  In determining whether specific jurisdiction exists, the court considers (1) the extent to which the defendant has purposefully availed himself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable. Mitrano, 377 F.3d at 407; Carefirst, 334 F.3d at 397; ALS Scan, Inc. v. Digital Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002) (alteration & internal quotation marks omitted).

The reasonableness inquiry is guided by additional factors, as noted by Judge Wilkinson in reliance upon settled precedent: "Overall, courts 'must consider [1] the burden on the defendant, [2] the interests of the forum State, and [3] the plaintiff's interest in obtaining relief' when determining whether the exercise of jurisdiction is reasonable in any given case." Base Metal Trading, Ltd. v. OJSC Novokuznetsky Aluminum Factory, 283 F.3d 208, 213-14 (4th Cir. 2002) (quoting Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987)).

In making its determination, the court does not simply engage in "contact counting":

13

> We should not "merely . . . count the contacts and
> quantitatively compare this case to other preceding
> cases." Id. Even a single contact may be sufficient to
> create jurisdiction when the cause of action arises
> out of that single contact, provided that the
> principle of "fair play and substantial justice" is
> not thereby offended. Id. (citing Burger King Corp.
> v. Rudzewicz, 471 U.S. 462, 477-78, 105 S.Ct. 2174, 85
> L.Ed.2d 528 (1985)); see McGee v. Int'l Life Ins. Co.,
> 355 U.S. 220, 223-24, 78 S.Ct. 199, 2 L.Ed.2d 223
> (1957).

Carefirst, 334 F.3d at 397.

At all points, the touchstone of the inquiry remains the defendant's contacts with the forum. See ESAB, 126 F.3d at 626 (stating "[a]lthough the place that the plaintiff feels [i.e., senses] the alleged injury is plainly relevant to the [jurisdictional] inquiry, it must ultimately be accompanied by the defendant's own [sufficient minimum] contacts with the state if jurisdiction . . . is to be upheld.") (quoted in New Haven Advocate, 315 F.3d at 262)).

B.   Progenitor's Motions

George S. Goldberger is Progenitor's Vice President of Business Development.  He avers that Progenitor is neither qualified nor registered to do business in West Virginia.  He also testifies as follows:

> Progenitor, at all times relevant to the Complaint,
> did not: (a) have any offices or other places of

14

> business in West Virginia; (b) maintain any employees
> in West Virginia; (c) have an appointed agent for
> service of process in West Virginia; (d) own any real
> estate property in West Virginia; (e) maintain any
> telephone listings or bank accounts in West Virginia;
> (f) actively advertise or market its services to West
> Virginia citizens within the meaning of applicable
> law; and (g) ship the subject blood product from West
> Virginia or to West Virginia.

(Aff. of George S. Goldberger ¶ 6). Mr. Goldberger's affidavit

forms the basis for Progenitor's assertion that it may not

constitutionally be called to court in West Virginia.[1]

Plaintiffs do not dispute Mr. Goldberger's sworn allegations.

Plaintiffs respond by alleging that Progenitor is

subject to both general and specific jurisdiction. Respecting

the exercise of general jurisdiction, plaintiffs seem only to

speculate. (<u>See</u> Pls.' Resp. at 4 ("The volume of the cord blood

stored by Progenitor and the identities of the owners of that

cord blood <u>is not known at this time</u>" and "[T]he number of West

Virginia residents using Progenitor to store cord blood <u>could</u>

<u>well be substantial</u>." (emphasis added))).

Assuming discovery on those matters would support

plaintiffs' viewpoint, the contention misses the mark. The

_____

[1] Progenitor also asserts that it engaged in no
jurisdiction-giving act under the West Virginia long-arm
statute. In light of <u>Celotex</u>, the court need not reach the
assertion.

question is not how many West Virginians' blood is stored with Progenitor but, instead, how, if at all, Progenitor affirmatively expressed "an intention to benefit from and thus an intention to submit to the laws of" West Virginia. J. McIntyre, 131 S. Ct. at 2787 (citations omitted). No such intention is shown presently nor is the promise of it forecast. In sum, there are no continuous and systematic contacts by Progenitor with West Virginia and no proffer that discovery might generate any. At bottom, Progenitor makes money from its contractual relationship with CorCell or Cord Blood and not from availing itself of the beneftis and protections of doing business in West Virginia.

Second, plaintiffs assert that Progenitor is subject to specific jurisdiction inasmuch as it became plaintiffs' bailee for hire by taking custody of the sample and agreeing to store it at its New Jersey facility. In apparent recognition of the fact that no express contract existed between plaintiffs and Progenitor, they assert that an implied contract to that effect arose by implication. While conceding that the sample was delivered to the Program at Duke in North Carolina, plaintiffs asserts that they could have demanded it be delivered to them in West Virginia.

Again, as plaintiffs concede, they had no express contract with Progenitor.  Their contract was with CorCell.  Any bailment created under this scenario results in CorCell being deemed the bailor and Bergen and Progenitor as the bailees. That unassailable fact aside, there is no basis in law for exercising personal jurisdiction under the implied bailment theory suggested by plaintiffs.  That tenuous model, and the follow-on, comparatively weaker theories relied upon by plaintiffs, would result in the exercise of personal jurisdiction under circumstances that plainly do not comport with traditional notions of fair play and substantial justice and are otherwise constitutionally unreasonable.  Specific jurisdiction does not exist.

Plaintiffs also offer no legally worthwhile basis for inquiring further into the matter through jurisdictional discovery.  See Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc., 334 F.3d 390, 402 (4th Cir. 2003)(affirming denial of request for jurisdictional discovery where the movant's specific affidavits were coupled with the nonmovant's lack of any concrete proffer supporting entitlement to further inquiry).

The court, accordingly, ORDERS that Progenitor's motion to dismiss for lack of personal jurisdiction be, and it

17

hereby is, granted.  In light of this ruling, it is further
ORDERED that Progenitor's additional motions to dismiss for
improper venue and to transfer for forum non conveniens be, and
they hereby are, denied without prejudice as moot.


C.   Bergen's Motion


        Bergen offers the affidavit of Dennis Todd, its
President and Chief Executive Officer.  Mr. Todd avers that
Bergen has no facilities in West Virginia, does not advertise in
West Virginia, and lacks a telephone listing, business address,
bank account, or any real or personal property in the state at
this or any other time.  Mr. Todd also asserts that Bergen does
not cause any broadcasts of its advertisements into West
Virginia and that its website is purely informational in nature
and not soliciting business.  Plaintiffs do not dispute these
sworn allegations.

        Bergen candidly concedes that it shipped some
"platelet packs" into Charleston at the request of a hospital in
November 2011, after this action was instituted.  The sale was
"not as the result of any sales efforts or advertisements
promulgated by Bergen."  (Aff. of Dennis Todd ¶ 7).  Bergen
terms the shipments as "isolated incidents that . . . never

18

occurred prior to or since the given dates. (<u>Id.</u>)  It also notes the mislabeling of the sample in this case occurred at its facility in New Jersey.

In response to these uncontested factual averments, plaintiffs first raise the same bailee-for-hire contention previously rejected in relation to Progenitor.  That assertion is not well taken for the reasons earlier expressed.  Plaintiffs also offer the same jurisdictional discovery request, saying it would support general jurisdiction over Bergen.  As with the same entreaty relating to Progenitor, the assertion is speculative and not forecast to give rise to jurisdictional fodder.[2]

_____

[2] Respecting both Progenitor and Bergen, a single allegation in the complaint states as follows:

> At all times relevant herein, all of the Defendants .
> . . were principals and/or agents of each other and
> were regularly conducting business by soliciting and
> marketing their blood collecting and storing
> activities within Kanawha County and West Virginia and
> therefore are subject to personal jurisdiction in West
> Virginia.

(Compl. ¶ 6).  This unadorned assertion matters little in the jurisdictional calculus.  <u>See</u> <u>Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.</u>, 591 F.3d 250, 253-54 (4th Cir. 2009) ("[W]e need not accept the legal conclusions drawn from the facts, and we need not accept as true unwarranted inferences, unreasonable conclusions or arguments.") (quoting <u>Giarratano v. Johnson</u>, 521 F.3d 298, 302 (4th Cir. 2008)).  Additionally, "[i]n the typical case, the contacts

The court, accordingly, ORDERS that Bergen's motion to dismiss for lack of personal jurisdiction be, and it hereby is, granted.


D.   Cord Blood's Motion to Dismiss for Lack of Personal Jurisdiction and Failure to State a Claim


Cord Blood offers the affidavit of Joseph R. Vicente, its Chief Operating Officer. Mr. Vicente submits a number of sworn allegations designed to distance his principal from this forum. He notes that Cord Blood has never been licensed or registered to do business in this state. He states additionally that Cord Blood has (1) never offered, advertised, or solicited its services in West Virginia, (2) has not engaged in a persistent course of business here, (3) has not derived substantial revenue for cord blood services rendered here, (4) has not owned or rented any real or personal property in the state, (5) has never had an office or any other facilities, nor any employees or agents, located here, (6) has not, and has never been required, to pay West Virginia taxes, (7) has never

---

of a company are not attributed to a corporate agent for jurisdictional purposes." <u>ePlus Technology, Inc. v. Aboud</u>, 313 F.3d 166, 177 (2002).

had a telephone listing or mailing address in the state, and (8) has made no in-person contact with plaintiffs here.

Unlike the record respecting Progenitor and Bergen, there are jurisdictional allegations of sorts in plaintiffs' response brief that favor plaintiffs' position.  First, as plaintiffs have noted, Cord Blood admits the following contact with West Virginia:

> [Cord Blood] has agreements with certain health care insurance companies wherein insureds may receive preferred pricing for cord blood services. Prospective mothers are provided preferred pricing information from their health care insurance company regarding the cord blood services, and if interested, the prospective mother contacts Cord Blood America, Inc. to request additional information regarding the cord blood services.
>
> Cord Blood . . . currently has a preferred pricing arrangement with Highmark West Virginia, Inc., d/b/a Mountain State Blue Cross Blue Shield.

(Aff. of Joseph R. Vicente ¶¶ 15-16).  Second, Mr. Vicente notes the payment arrangement undertaken by Ms. Bays.  She sent annual remittances not to CorCell but rather to Cord Blood at its offices outside West Virginia.

Third, while asserting Ms. Bays entered into the Participation Agreement with CorCell, Mr. Vicente also notes a relevant transaction between that entity and Cord Blood.  Cord Blood entered into an Asset Purchase Agreement with CorCell on a date unstated by Cord Blood.  As a part of the Asset Purchase

Agreement, Cord Blood purchased use of the CorCell trade name.
There was also apparently one or more Existing Samples Purchase
Agreements between Cord Blood and CorCell, which likely dealt
with the inventory of samples in CorCell's custody or control at
the time of the execution of those agreements.

Plaintiffs assert in their response memorandum that
their investigation following the institution of this action
reveals that "at the time that . . . [Ms. Bays] was solicited,
Cord Blood . . . was already controlling CorCell['s] . . .
operations and doing business under the general name of
'CorCell' and 'The CorCell Program.'"  (Resp. at 4).  They peg
the date of the Asset Purchase Agreement as October 2006.  The
discussion that follows thereafter in the response memorandum,
which is admittedly unverified and based upon unauthenticated
exhibits, discloses a rather complex timeline surrounding the
CorCell and Cord Blood asset-purchase transaction.  For this and
other reasons, plaintiffs state "justice requires" they be given
an opportunity through discovery to illuminate "the complex
contractual relationships and corporate dealings of these [two]
Defendants . . . ."  (Resp. at 7).

Unlike the circumstances surrounding the Progenitor
and Bergen motions discussed supra, plaintiffs have provided a
sufficient basis to justify a tailored period of jurisdictional

discovery to more fully develop the proffer found in their response memorandum.

The court, accordingly, ORDERS that Cord Blood's motion to dismiss be, and it hereby is, denied without prejudice.[3]  It is further ORDERED as follows:

1. That plaintiffs be, and they hereby are, given leave until July 16, 2012, to conduct jurisdictional discovery respecting CorCell and Cord Blood's contacts with this forum; and

2. That Cord Blood be, and it hereby is, given leave, by motion, to renew its challenge to personal juris-diction no later than July 23, 2012.

---

[3] The court notes that Cord Blood also moves to dismiss pursuant to Rule 12(b)(6) based upon (1) the Informed Consent and Release putatively absolving CorCell of liability, (2) the failure to state a claim for intentional infliction of emotional distress, and (3) the inartful pleading of plaintiffs' successor liability claim.  The better course from a sequencing standpoint is to hold the analysis of these contentions in abeyance pending development and disposition of the personal jurisdiction challenge, which may obviate the need to address the Rule 12(b)(6) issues.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER:  May 8, 2012

John T. Copenhaver, Jr.
United States District Judge